**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

Rick A. Styen,                                   :              Case No. 4:12 CV 455
                                                 :
        Plaintiff,                              :
                                                 :
v.                                               :
                                                 :
Commissioner of Social Security,                 :              **REPORT AND**
        Defendant,                              :              **RECOMMENDATION**

## I. INTRODUCTION

Plaintiff Rick A. Styen ("Plaintiff") seeks judicial review, pursuant to 42 U.S.C. § 405(g) of

Defendant Commissioner's ("Defendant" or "Commissioner") final determination denying his claim

for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C. §§§ 416(i), 423, and 1381 (Docket No. 1).

Pending are the parties' Briefs on the Merits (Docket Nos. 16 and 17). For the reasons that follow, the

Magistrate recommends that the decision of the Commissioner be affirmed

## II. PROCEDURAL BACKGROUND

Plaintiff protectively filed applications for DIB and SSI under Title XVI of the Social Security Act, 42 U.S.C. § 1381 on November 12, 2008 (Docket No. 12, p. 24 of 520).[1] On November 24, 2008, Plaintiff again filed an application for a period of DIB under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423 (Docket No. 12, pp. 156-57 of 520). In his applications, Plaintiff alleged a period of disability beginning January 28, 2006 (Docket No. 12, p. 156 of 520). Plaintiff's claims were denied initially on March 13, 2009 (Docket No. 12, pp. 94-100 of 520), and upon reconsideration on September 3, 2009 (Docket No. 12, pp. 104-17 of 520). Plaintiff thereafter filed a timely written request for a hearing (Docket No. 12, pp. 118-19 of 520).

On February 15, 2011, Plaintiff appeared with counsel for a hearing before Administrative Law Judge Brian B. Rippel ("ALJ Rippel") (Docket No. 12, pp. 36-71 of 520). Also appearing at the hearing was an impartial Vocational Expert ("VE") (Docket No. 12, p. 38 of 520). ALJ Rippel found Plaintiff to have a severe combination of back pathology (including degenerative disc disease, a herniated disc with facet hypertrophy, foraminal stenosis, and chronic back and leg pain), foot pain (including plantar fasciitis), bipolar disorder NOS, and a history of cannabis abuse, with an onset date of January 28, 2006 (Docket No. 12, p. 26 of 520).

Despite these limitations, ALJ Rippel determined, based on all the evidence presented, that Plaintiff had not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of his decision (Docket No. 12, p. 31 of 520). ALJ Rippel found Plaintiff had the residual functional capacity to perform a full range of light work with the following

---

[1] Plaintiff's application for SSI was not included in the record, but was in fact received and processed by Defendant and considered by the ALJ (Docket No. 12, pp. 24, 31 of 520).

2

exceptions:

1.  Must have a sit/stand option allowing one-hour alternative intervals
2.  No more than occasional bilateral foot control operation
3.  No work that requires more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling
4.  No work that requires climbing ladders, ropes, or scaffolds
5.  Must avoid concentrated exposure to cold, hazardous or moving machinery, and unprotected heights
6.  Work is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements
7.  Work should involve only simple work-related decisions with no more than occasional workplace changes
8.  Work should involve no more than occasional and superficial interaction with the public, coworkers, and supervisors

(Docket No. 12, p. 28 of 520). Additionally, ALJ Rippel found Plaintiff unable to perform any past relevant work, but able to perform other work in the economy (Docket No. 12, p. 30 of 520). Plaintiff's request for benefits was therefore denied (Docket No. 12, p. 31 of 520).

On February 24, 2012, Plaintiff, *pro se*, filed a Complaint in the Northern District of Ohio, Eastern Division, seeking judicial review of his denial of DIB and SSI (Docket No. 1). In his pleading, Plaintiff alleged that the ALJ erred by failing to base his decision on a legally sufficient record and by failing to give appropriate weight to the opinions of Plaintiff's treating physician (Docket No. 16). Defendant filed its Answer on May 18, 2012 (Docket No. 11).

### III. FACTUAL BACKGROUND

### A.   THE ADMINISTRATIVE HEARING

An administrative hearing convened on February 15, 2011, in Wheeling, West Virginia (Docket No. 12, p. 36 of 520). Plaintiff, represented by counsel Michael Mazanetz, appeared and testified via video from Youngstown, Ohio (Docket No. 12, pp. 38-63 of 520). Also present and testifying was VE Eugene Churchman ("VE Churchman") (Docket No. 12, pp. 63-71 of 520).

3

1.    PLAINTIFF'S TESTIMONY

At the time of the hearing, Plaintiff was a twenty-eight year old male with a twelfth grade

education (Docket No. 12, p. 40 of 520). Although Plaintiff completed the twelfth grade, he did not

graduate because he could not pass the reading proficiency test (Docket No. 12, p. 43 of 520). Plaintiff

testified that he does not have a GED (Docket No. 12, p. 43 of 520). When asked, Plaintiff indicated

that he could read to a certain extent, but has difficulty with reading comprehension and word

pronunciation (Docket No. 12, p. 43 of 520). Plaintiff testified that his most recent job was for U.S.

Express (Docket No. 12, p. 45 of 520). Plaintiff also testified that he currently holds a Commercial

Driver's License ("CDL") (Docket No. 12, p. 45 of 520). Plaintiff's only source of income since

leaving this job was food stamps (Docket No. 12, p. 44 of 520).

Plaintiff resides with his long-term girlfriend and their three children in his mother's trailer

(Docket No. 12, p. 41 of 520). He originally testified that he drives two to three times per week to the

grocery store (Docket No. 12, p. 42 of 520), but later stated that he does not drive but rather gets rides

from others (Docket No. 12, p. 44 of 520). Plaintiff also indicated that he smokes ten to twelve

cigarettes per day, down from two packs per day (Docket No. 12, p. 42 of 520). Plaintiff admitted to

using marijuana, the last time being six to eight months prior to the hearing (Docket No. 12, pp. 41-42

of 520). He stated that he had put on 140 pounds since 2006 (Docket No. 12, p. 41 of 520).

With regard to his back pain, Plaintiff testified that it was ongoing, stemming from an accident

he had in 2004 (Docket No. 12, p. 60 of 520). He testified that it was "severe," running down his legs,

making both his legs and feet numb (Docket No. 12, p. 47 of 520). He reported falling several times as

a result of this numbness, the most recent time being a week and a half prior to the hearing (Docket

No. 12, pp. 47-48 of 520). Plaintiff indicated that he uses a walking stick when he goes out in public

4

(Docket No. 12, p. 48 of 520). On a scale of one to ten, with ten being the most severe, Plaintiff rated

his pain at a level eight or nine, and described it as being constant (Docket No. 12, pp. 48-50 of 520).

However, Plaintiff also testified that there were times when the pain gets worse, although he was

unable to provide specific examples (Docket No. 12, p. 49 of 520).

Based on his limitations, Plaintiff stated that he spends most of his day alternating between

sitting in his recliner chair and laying down in his bed (Docket No. 12, p. 50 of 520). He indicated that

he could no longer participate in the activities he liked to do, including hiking, fishing, and playing

with his children (Docket No. 12, p. 49 of 520). When asked how much weight he could lift, Plaintiff

stated that he does not even pick up his youngest daughter, who weighs fifteen pounds, because it hurts

his back (Docket No. 12, p. 51 of 520). Plaintiff testified that he could stand for a maximum of forty

minutes before needing to sit down and, when seated, could only remain seated for a maximum of one

hour before needing to stand up (Docket No. 12, p. 51 of 520). Plaintiff also stated that he was not

taking any prescription medication for his back and leg pain out of fear that the medication would

"mess[] with [his] organs" (Docket No. 12, pp. 52-53 of 520).

Plaintiff then testified about his migraines, stating that he gets them every day (Docket No. 12,

p. 51 of 520). According to Plaintiff, the headaches get so bad that they cause him to become

nauseated and vomit, as well as experience sensitivity to light and sound (Docket No. 12, pp. 51-52 of

520). Plaintiff indicated that he had tried prescription medication for the migraines but either the

medications did not work or were not covered by Plaintiff's insurance, so he stopped taking them

(Docket No. 12, p. 52 of 520).

Plaintiff also testified regarding his mental illness and accompanying symptoms. He indicated

that he has suicidal thoughts one to two times per month and had previously attempted suicide, the

5

most recent time four months prior to his hearing when he attempted to hang himself in his barn (Docket No. 12, p. 49 of 520). Plaintiff described himself as "messed up," and believes he is being treated for "being a nut case" (Docket No. 12, pp. 53-54 of 520). Plaintiff stated that he would "spasz[sic] out on people," wanting to "grab them up" (Docket No. 12, p. 54 of 520). Plaintiff admitted to almost going to jail for grabbing and choking another person (Docket No. 12, p. 54 of 520). Plaintiff also stated that when he has these moments, he does not remember what he has done (Docket No. 12, p. 54 of 520). He is seeking counseling at The Counseling Center in Lisbon, Ohio, and has been prescribed an antidepressant, but is not involved in any type of anger management therapy (Docket No. 12, pp. 53-55, 57 of 520). Plaintiff also indicated that he has difficulty sleeping, normally getting four hours of sleep per night, but up to eight hours if he takes a sleeping pill (Docket No. 12, p. 57 of 520).

ALJ Rippel then questioned Plaintiff about an alleged incident involving Plaintiff punching a hole in the wall (Docket No. 12, p. 55 of 520). Plaintiff testified that he had never punched a hole in any wall, despite what his mental health practitioners stated (Docket No. 12, p. 55 of 520). He admitted to taking a baseball bat to both his car and home doors and windows (Docket No. 12, pp. 55-56 of 520). Plaintiff stated that the most recent incident of his physical violence occurred two weeks before the hearing when he kicked in the door of his trailer (Docket No. 12, p. 56 of 520). Plaintiff also admitted to being violent towards his girlfriend, to the extent that the sheriff was called out, but denied ever being violent towards his children (Docket No. 12, p. 56 of 520). He indicated that his violent tendencies were one of the reasons he never left his house: he did not "want to end up in jail for [his] mental problems that [he] can't control" (Docket No. 12, p. 56 of 520).

Plaintiff also testified about his problems with his feet. According to Plaintiff, his feet are numb and become discolored (Docket No. 12, p. 59 of 520). Plaintiff stated that he saw a podiatrist who

6

provided him with foot orthotics and administered two shots of cortisone (Docket No. 12, p. 58 of 520). Plaintiff testified that the podiatrist told him that his problems were not in his feet, but rather in his back (Docket No. 12, p. 58 of 520).

When asked by the ALJ if he could take care of personal and household needs, Plaintiff responded in the negative (Docket No. 12, p. 60 of 520). Plaintiff indicated that his girlfriend, stepfather, and mother take care of the household chores and caring for the children (Docket No. 12, p. 60 of 520). He also testified that his girlfriend sometimes has to help him bathe and put on his shoes (Docket No. 12, p. 60 of 520). Because of her responsibilities around the house and with the children, Plaintiff's girlfriend is not employed (Docket No. 12, pp. 60-61 of 520).

On cross-examination, Plaintiff's attorney questioned Plaintiff about the short-lived nature of the jobs held by Plaintiff after his accident (Docket No. 12, p. 61 of 520). Plaintiff indicated that he was terminated for failing to perform the jobs to the required level because of his pain (Docket No. 12, p. 62 of 520). Plaintiff also admitted that he was terminated from three jobs because he was involved in fights with his bosses and threatened to kill them (Docket No. 12, p. 62 of 520).

### 2.   VOCATIONAL EXPERT TESTIMONY

Having familiarized himself with Plaintiff's file and vocational background prior to the hearing, the VE described Plaintiff's past work as a truck driver as medium and semiskilled, his past work as a truck laborer as heavy and unskilled, his past work as a garbage man as very heavy and unskilled, and his work as a brickyard laborer as heavy and unskilled (Docket No. 12, pp. 65-66 of 520).

ALJ Rippel then posed the first of his hypothetical questions:

. . . please assume an individual of the claimant's age, education and work experience, who is capable of performing work at the medium exertional level. The individual should no

7

more than frequently stoop, kneel, crouch or crawl. Work would be limited to simple, routine and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work related decisions with few, if any, workplace changes, and work would be limited to only occasional and superficial interaction with the public, coworkers or supervisors. Would an individual with those limitations be able to perform [Plaintiff's] prior work?

(Docket No. 12, p. 66 of 520). Taking into account these limitations, the VE testified that such an

individual would not be able to perform Plaintiff's past work (Docket No. 12, p. 66 of 520). The VE

stated that there was other work the hypothetical person could perform including: (1) vacuum cleaner

operator, DOT 389.683-010, for which there are 42,000 positions nationally and 275 regionally;[2] (2)

industrial cleaner, DOT 381.687-018, for which there are 75,000 positions nationally and 900 in

regionally; and (3) equipment washer, DOT 381.687-022, for which there are 82,000 positions

nationally and 2,600 regionally (Docket No. 12, p. 67 of 520).

ALJ Rippel then posed a second hypothetical:

. . . the individual would be capable of performing work at the light exertional level, would need a sit/stand option, allowing the person to alternate sitting or standing positions at one hour intervals throughout the day, remaining on task. No more than frequent foot control operation of the bilateral legs. No more than occasional climbing ramps or stairs, balancing at times with the assistance of a hand held assistive device. Stooping, kneeling, crouching, crawling, never climbing ladders, ropes or scaffolds. Avoiding concentrated exposure to the operational control of moving machinery, hazardous machinery and unprotected heights, moving machinery there referring to industrial type machinery and the same mental limitations as the last hypothetical. If an individual had those limitations, would [he] be able to perform [Plaintiff's] prior work?

(Docket No. 12, p. 67 of 520). Taking into account these limitations, the VE testified that such an

---

[2] VE Churchman defined the regional economy as "development region Number 10, the following counties; Belmont, Guernsey, Harrison, Columbiana, Jefferson . . . development region Number 11; Monroe, Noble and Washington County . . . [and] in West Virginia . . . Vestment Region Number 5 and from Pennsylvania, part of the Pittsburgh Metropolitan statistical area consisting of Allegheny, Washington and Beaver County" (Docket No. 12, pp. 64-65 of 520).

individual would not be able to perform Plaintiff's past work (Docket No. 12, p. 67 of 520). The VE stated that there was other work the hypothetical person could perform including: (1) collator operator, DOT 208.685-010, for which there are 55,000 positions nationally and 625 regionally; (2) folding machine operator, DOT 208.685-014, for which there are 73,000 positions nationally and 925 regionally; and (3) photographic machine operator, DOT 207.685-018, for which there are 85,000 positions nationally and 2,225 regionally (Docket No. 12, p. 68 of 520). The VE indicated that his testimony would not be different if, rather than no more than frequent foot control, the hypothetical was "no more than occasional" foot control (Docket No. 12, p. 68 of 520). VE Churchman also stated that his opinion would not be different even if the hypothetical individual, rather than being limited to only occasional and superficial interaction with others, was limited to minimal interaction with the public, coworkers, and supervisors (Docket No. 12, p. 68 of 520).

In his third hypothetical, ALJ Rippel asked the VE to assume all the same previous limitations but assume that the individual would only be able to perform work at a sedentary level (Docket No. 12, p. 68 of 520). Again, the VE indicated that an individual with such limitations could not perform Plaintiff's prior work but could perform other work, including: (1) printer, DOT 652.685-038, for which there are 71,000 positions nationally and 425 regionally; (2) final assembler for bench assembly, DOT 713.687-018, for which there are 45,200 positions nationally and 210 regionally; and (3) laminator, DOT 690.685-258, for which there are 73,025 positions nationally and 600 regionally (Docket No. 12, pp. 68-69 of 520).

Finally, ALJ Rippel questioned the VE about the tolerance level of employers with regard to employees being off-task (Docket No. 12, p. 69 of 520). VE Churchman testified that an employee would be terminated if he were off task more than ten percent of the time (Docket No. 12, p. 69 of

520). The VE stated that typically employees have up to sixty minutes of off-task time in the morning, thirty to forty-five minutes for lunch, and up to thirty minutes in the afternoon (Docket No. 12, p. 69 of 520). VE Churchman indicated that these breaks are only provided if the employee is caught up with his work at the time of the break (Docket No. 12, p. 69 of 520). The VE testified that any more than two unexcused absences per month, taken on a regular basis, would result in an employee's termination (Docket No. 12, p. 69 of 520).

## B.    MEDICAL RECORDS

Plaintiff's medical records regarding his lower back pain date back to October 13, 2004, the day of Plaintiff's first car accident (Docket No. 12, p. 367 of 520). Plaintiff initially declined medical attention at the scene of the accident, reporting no injuries, but later noticed some stiffening of his lower back (Docket No. 12, p. 367 of 520). Plaintiff rated his pain as a five out of a possible ten (Docket No. 12, p. 367 of 520). X-rays revealed no evidence of any acute pathology, fracture, or dislocation, and Plaintiff was diagnosed with acute low back strain/sprain with radicular pain to his right leg (Docket No. 12, p. 367 of 520).

Plaintiff's records then jump to August 29, 2005, when he presented in the Salem Community Hospital Emergency Department ("Salem ER") complaining of right flank pain (Docket No. 12, p. 284 of 520). Hospital staff noted some mild tenderness over Plaintiff's right paravertebral lumbar musculature, and he was diagnosed with an acute lumbar strain and discharged (Docket No. 12, p. 285 of 520). One month later on September 29, 2005, Plaintiff began a series of sessions with Richard E. Tsai, D.C. ("Dr. Tsai"), a chiropractor (Docket No. 12, p. 256 of 520). At that time, Plaintiff rated his back pain as a five out of a possible ten, and his neck pain at a level eight out of ten (Docket No. 12, p. 256 of 520). After conducting x-rays, Dr. Tsai noted that Plaintiff suffered from a right lateral flexion

10

subluxation, decreased disc space, and foraminal compression at his L4-5 vertebrae (Docket No. 12, p. 256 of 520). Plaintiff received full spine adjustments on September 29, 2005, September 30, 2005, October 3, 2005, October 6, 2005, and October 7, 2005 (Docket No. 12, pp. 257-58 of 520).

Reporting little to no improvement with Dr. Tsai, Plaintiff began seeing Dr. Richard Simmons ("Dr. Simmons") on October 10, 2005 (Docket No. 12, p. 366 of 520). Dr. Simmons diagnosed Plaintiff with a cervical, thoracic, lumbar strain/sprain (Docket No. 12, p. 366 of 520). On October 12, 2005, Plaintiff began physical therapy with Edward F. Silverio ("Mr. Silverio") (Docket No. 12, p. 260 of 520). At that time, Plaintiff reported his lower back pain to be at level seven or eight out of ten (Docket No. 12, p. 260 of 520). Plaintiff also stated that he had previously suffered from bilateral anterior thigh and right upper extremity numbness, but reported that those symptoms had fully subsided (Docket No. 12, p. 260 of 520). Upon examination, Mr. Silverio noted that Plaintiff's sitting and standing posture was poor, but noted that Plaintiff had good rehabilitation potential (Docket No. 12, pp. 260-61 of 520). Plaintiff reported an improvement in his symptoms due to the physical therapy during a November 11, 2005, appointment with Dr. Simmons (Docket No. 12, p. 358 of 520). Plaintiff was discharged from physical therapy on November 14, 2005, after fifteen sessions (Docket No. 12, pp. 270, 357 of 520). Mr. Silverio noted that Plaintiff's lumbar spine had a full range of motion without pain and Plaintiff had even attempted some activities such as cutting wood (Docket No. 12, pp. 270, 357 of 520).

On November 16, 2005, Plaintiff underwent a CT scan of his lumbar spine at the request of Dr. Simmons (Docket No. 12, pp. 283, 356 of 520). Plaintiff's scan was normal, showing no fracture or dislocation, significant bulging, facet hypertrophy, spinal stenosis, or herniated discs (Docket No. 12, pp. 283, 356 of 520). However, the test did show the presence of Schmorl's Nodes at the L5-S1

11

vertebrae (Docket No. 12, pp. 283, 356 of 520).[3] By November 23, 2005, Plaintiff reported to Dr.

Simmons that he felt ready to return to work and Dr. Simmons granted Plaintiff clearance to do so

(Docket No. 12, p. 354 of 520).

Plaintiff's medical records then jump to August 19, 2006, when Plaintiff presented in the Salem

ER complaining of headaches (Docket No. 12, p. 293 of 520). Plaintiff reported that he had been

involved in another car accident on August 16, 2006, and had been experiencing headaches ever since

the accident (Docket No. 12, p. 293 of 520). Plaintiff rated his level of pain to be a seven or eight out

of ten (Docket No. 12, p. 293 of 520). A head CT scan was unremarkable, showing no concussion, and

Plaintiff refused medication (Docket No. 12, pp. 294, 297 of 520). Hospital records state that even

though Plaintiff reported his pain to be a seven or eight, Plaintiff did "not seem to be in that much

distress" (Docket No. 12, p. 293 of 520). An examination of Plaintiff's cervical spine was also normal

at this time (Docket No. 12, p. 295 of 520).

On November 22, 2006, Plaintiff returned to the Salem ER complaining of bilateral knee and

right foot pain (Docket No. 12, pp. 298, 344 of 520). X-rays taken of these areas were unremarkable

(Docket No. 12, pp. 298, 344 of 520). On April 9, 2007, Dr. Simmons ordered a Medical Imaging

Exam of Plaintiff's left wrist (Docket No. 12, p. 341 of 520). The report showed demineralization of

Plaintiff's wrist, but no other definite abnormality (Docket No. 12, p. 341 of 520). On this same date,

Plaintiff also underwent a thoracic spine imaging evaluation (Docket No. 12, p. 342 of 520). The

report indicated that "there [was] no evidence of fracture, discoloration, destruction lesion, or soft

tissue abnormality" (Docket No. 12, p. 342 of 520). Plaintiff underwent another MRI of his thoracic

---

[3] A Schmorl's Node is a portion of the nucleus pulposus that has protruded into an adjoining
vertebrae. *Dorland's Illustrated Medical Dictionary* 234 (32nd ed. 2012).

spine at the request of Dr. William Crawford, M.D. ("Dr. Crawford") on June 29, 2007 (Docket No. 12, p. 339 of 520). The results of this evaluation were normal (Docket No. 12, p. 339 of 520).

On July 18, 2007, Plaintiff saw Dr. Mark Peckman, D.O. ("Dr. Peckman") at the Pain Management Center for multi-factorial pain in his back (Docket No. 12, p. 336 of 520). Dr. Peckman described Plaintiff as a poor historian, giving only non-descript complaints (Docket No. 12, p. 336 of 520). Dr. Peckman noted that Plaintiff possessed a relatively good and ample ambulatory gait and suggested that Plaintiff was a good candidate for electro-stimulation through a Transcutaneous Electrical Nerve Stimulation ("TENS") unit (Docket No. 12, p. 337 of 520).

Plaintiff returned to Dr. Simmons on February 5, 2008, complaining of pain in his heel area (Docket No. 12, pp. 302, 391-92 of 520). Dr. Simmons found no fracture or arthritic changes in Plaintiff's evaluation (Docket No. 12, pp. 302, 391-92 of 520). Four days later, on February 9, 2008, Plaintiff visited Dr. Mark Smesko, D.P.M ("Dr. Smesko") complaining of ongoing bilateral heel pain (Docket No. 12, p. 314 of 520). Plaintiff denied any numbness or tingling in his feet, and Dr. Smesko found his muscle strength to be full without any deficits (Docket No. 12, p. 314 of 520). Plaintiff was diagnosed with heel spur syndrome, a pes cavus deformity, and plantar fasciitis and tenosynovitis[4] bilaterally (Docket No. 12, p. 314 of 520). Plaintiff was given a steroid injection, bilateral airheel orthotics, and a right night splint (Docket No. 12, p. 315 of 520). Plaintiff saw Dr. Annmarie Bonetti, D.O. ("Dr. Bonetti") on February 11, 2008, complaining of general pain (Docket No. 12, p. 328 of 520). Dr. Bonetti noted that Plaintiff was only doing his ordered exercises one time per day instead of the two to three times per day as prescribed (Docket No. 12, pp. 328-29 of 520).

---

[4] Tenosynovitis is inflammation of a tendon sheath. *Dorland's Illustrated Medical Dictionary* 1882 (32nd ed. 2012).

13

Plaintiff returned to Dr. Smesko on February 28, 2008, reporting an improvement in his pain but the onset of bilateral numbness in his lower legs and feet (Docket No. 12, p. 313 of 520). Plaintiff had a similar visit with Dr. Smesko on March 12, 2008 (Docket No. 12, p. 312 of 520). He underwent an EMG of his spine on March 26, 2008, which revealed normal peroneal and tibial responses (Docket No. 12, p. 405 of 520). The test showed no evidence of radiculopathy, peripheral neuropathy, or entrapment neuropathy (Docket No. 12, p. 405 of 520).

On May 21, 2008, Plaintiff returned to Dr. Smesko after a two-month hiatus still complaining of bilateral heel and arch pain (Docket No. 12, p. 311 of 520). Dr. Smesko discussed a possible consultation with a physiatrist or pain clinic if Plaintiff's pain persisted (Docket No. 12, p. 311 of 520). On June 4, 2008, Dr. Smesko gave Plaintiff functional orthotic devices for his plantar fasciitis (Docket No. 12, p. 310 of 520).

Plaintiff had a consultation with Dr. Ronald M. Yarab, Jr. ("Dr. Yarab") on July 31, 2008 (Docket No. 12, p. 401 of 520). Dr. Yarab reported that Plaintiff had good muscular strength, but noted that he suffered from some tenderness of the lumbosacral junction (Docket No. 12, p. 401 of 520). Dr. Yarab scheduled Plaintiff for an MRI (Docket No. 12, p. 401 of 520). This scan did not reveal any significant abnormalities in Plaintiff's spine, and Dr. Yarab started Plaintiff on Flexeril and suggested a possible course of trigger point injections if Plaintiff's pain persisted (Docket No. 12, p. 400 of 520). Plaintiff underwent another MRI on October 8, 2008 (Docket No. 12, p. 459 of 520). This evaluation revealed a mild change in Plaintiff's degenerative disc and joint disease and minimal disc bulges at Plaintiff's L4-5 and L5-S1 vertebrae, without spinal stenosis or nerve root compression (Docket No. 12, p. 459 of 520). Dr. Yarab recommended Plaintiff undergo a vascular study (Docket No. 12, p. 399 of 520).

14

On November 12, 2008, Plaintiff underwent a bilateral S1 transforaminal epidural steroid injection with Dr. Sean T. McGrath, M.D. ("Dr. McGrath") (Docket No. 12, pp. 317, 384 of 520). On November 18, 2008, Plaintiff returned to Dr. McGrath for his follow-up visit, still complaining of pain (Docket No. 12, p. 397 of 520). Dr. McGrath noted that Plaintiff was able to walk around under his own power and had only a bit of a forward posture (Docket No. 12, p. 397 of 520). Dr. McGrath also noted that Plaintiff demonstrated severe tenderness of his paraspinal and sciatic notches (Docket No. 12, p. 397 of 520). A CT scan revealed very mild congenital stenosis overall (Docket No. 12, p. 398 of 520).

On November 21, 2008, Plaintiff underwent another MRI of his lumbar spine, which revealed mild multi-level degenerative disc disease and spondylotic changes of his lumbar spine (Docket No. 12, pp. 324, 374 of 520). An August 1, 2009, MRI revealed these same conditions (Docket No. 12, p. 463 of 520). It also showed an acute Schmorl's Node deformity of the inferior endplate of the L5 vertebrae (Docket No. 12, p. 463 of 520). An MRI of Plaintiff's cervical spine done at this same time was unremarkable (Docket No. 12, p. 465 of 520).

Plaintiff underwent a bone scan on August 11, 2009, after complaining of numbness and tingling down both legs (Docket No. 12, p. 460 of 520). This scan showed no abnormal uptake of radiotracer throughout Plaintiff's lumbar spine, but did show a mild increased uptake of radiotracer at his bilateral sternoclavicular and acromioclavicular joints, likely representing osteoarthritic degenerative change (Docket No. 12, p. 460 of 520). On November 24, 2009, Plaintiff returned to Dr. McGrath still complaining of severe back pain (Docket No. 12, p. 396 of 520). Plaintiff demonstrated a severe tenderness of his paraspinals, sciatic notch, and sacroiliac joints (Docket No. 12, p. 396 of 520). Dr. McGrath recommended that Plaintiff see a surgeon (Docket No. 12, p. 396 of 520).

15

On May 12, 2010, Plaintiff presented to the St. Elizabeth Boardman Health Center Emergency Room ("St. Elizabeth ER") complaining of a headache (Docket No. 12, p. 495 of 520). A CT scan of Plaintiff's brain was normal and Plaintiff was treated and released (Docket No. 12, p. 495 of 520). On July 23, 2010, Plaintiff underwent an MRI of his head after complaining of migraines, dizziness, visual disturbances, and right and left-sided weakness in his arms and legs (Docket No. 12, p. 466 of 520). The MRI was normal (Docket No. 12, p. 466 of 520). Plaintiff returned to the St. Elizabeth ER on September 24, 2010, complaining of pain in his left hand (Docket No. 12, p. 484 of 520). He was diagnosed with a fracture involving the distal head of his fifth metacarpal (Docket No. 12, p. 484 of 520).

On October 4, 2010, Plaintiff reported to the Columbiana County Mental Health Center ("CCMHC") (Docket No. 12, p. 505 of 520). Plaintiff reported experiencing mood swings, depression, crying spells, anger management issues, suicidal ideations, and irritability (Docket No. 12, p. 505 of 520). His intake assessment noted that Plaintiff had a history of poor impulse control and had previously used cocaine, smoked marijuana, and consumed alcohol (Docket No. 12, p. 505 of 520). Plaintiff admitted to smoking one pack of cigarettes per day (Docket No. 12, p. 505 of 520). It was noted that Plaintiff had grown up in a violent household and was reportedly abused by his stepfather (Docket No. 12, p. 505 of 520).

On October 11, 2010, Plaintiff reported continued conflicts with his family to CCMHC staff, but appeared positive and receptive to intervention (Docket No. 12, p. 501 of 520). On October 25, 2010, during a therapy session, Plaintiff stated that he wanted to move to West Virginia (Docket No. 12, p. 500 of 520). Plaintiff's therapy focused primarily on an exploration of his anger issues and healthy ways to avoid conflicts with his family and others (Docket No. 12, p. 500 of 520).

16

On November 1, 2010, Plaintiff had an MRI of his lumbar spine (Docket No. 12, p. 520 of 520). The scan revealed a herniated disc at the L4-5 vertebrae and a bulging disc at the L5-S1 vertebrae (Docket No. 12, p. 520 of 520).

C.    EVALUATIONS

     1.    CLINICAL INTERVIEW

Plaintiff underwent a one-time clinical interview with Dr. Claudia E. Johnson Brown, Ph.D ("Dr. Brown") at the request of the Bureau of Disability Determination ("BDD") on January 12, 2009 (Docket No. 12, p. 417 of 520). Dr. Brown diagnosed Plaintiff with Bipolar Disorder NOS and assigned him a Global Assessment of Functioning ("GAF") score of forty (Docket No. 12, p. 423 of 520).[5] She noted that Plaintiff was mildly impaired in his ability to: (1) understand, remember, and follow instructions; and (2) maintain attention and concentration to perform single repetitive tasks (Docket No. 12, p. 422 of 520). Dr. Brown found Plaintiff to be markedly impaired in his ability to: (1) relate to others, including fellow workers and supervisors; and (2) withstand the stresses and pressure associated with day-to-day work activity (Docket No. 12, p. 422 of 520).

     2.    MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT/PSYCHIATRIC REVIEW TECHNIQUE

Plaintiff underwent a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique with state agency doctor Robyn Hoffman, Ph.D. ("Dr. Hoffman") on March 2, 2009 (Docket No. 12, p. 431 of 520). Dr. Hoffman's results were very similar to those of Dr. Brown (Docket

_____

     [5] The Global Assessment of Functioning Scale is a 100-point scale that measures a patient's overall level of psychological, social, and occupational functioning on a hypothetical continuum. A score of 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (hereinafter DSM-IV) 34 (Am. Psychiatric Ass'n) (4th ed. 1994).

No. 12, p. 433 of 520). Dr. Hoffman found Plaintiff to be moderately limited in his ability to: (1) understand and remember detailed instructions; (2) work in coordination with or proximity to others without being distracted by them; (3) complete a normal workday and work week without interruption and perform at a consistent pace; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (7) respond appropriately to changes in the work setting (Docket No. 12, pp. 431-32 of 520).

With regard to the Psychiatric Review Technique, Dr. Hoffman also diagnosed Plaintiff with Bipolar Disorder NOS (Docket No. 12, p. 438 of 520) as well as cannabis use in early sustained remission (Docket No. 12, p. 443 of 520). Dr. Brown found Plaintiff to have a mild restriction of the activities of daily living and maintaining concentration, persistence, or pace, and moderate difficulty in maintaining social functioning (Docket No. 12, p. 445 of 520).

### 3.    PHYSICAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On March 12, 2009, Plaintiff underwent a Physical Residual Functional Capacity Assessment with State agency physician Dr. Nick Albert, M.D. ("Dr. Albert") (Docket No. 12, p. 449 of 520). Dr. Albert determined that Plaintiff could: (1) occasionally lift and/or carry fifty pounds; (2) frequently lift and/or carry twenty-five pounds; (3) stand and/or walk with normal breaks for a total of six hours during an eight-hour workday; (4) sit with normal breaks for a total of six hours during an eight-hour workday; and (5) perform unlimited pushing and/or pulling (Docket No. 12, p. 450 of 520). Dr. Albert also reported that Plaintiff could frequently balance, stoop, kneel, crouch, and crawl (Docket No. 12, p. 451 of 520). Dr. Albert found no manipulative, visual, communicative, or environmental limitations (Docket No. 12, pp. 452-53 of 520).

18

#### 4.    INITIAL PSYCHIATRIC EVALUATION

Plaintiff underwent an Initial Psychiatric Evaluation at CCMHC with Dr. Vincent Paolone, M.D. ("Dr. Paolone") on November 12, 2010 (Docket No. 12, p. 516 of 520). Dr. Paolone found Plaintiff to have a constricted affect and dysphoric mood (Docket No. 12, p. 517 of 520). He noted that Plaintiff had chronic, daily thoughts that he would rather be dead, but no imminent suicidal intent was expressed (Docket No. 12, p. 217 of 520). Dr. Paolone diagnosed Plaintiff with Mood Disorder NOS, Personality Disorder NOS, and assigned a GAF score of fifty-five (Docket No. 12, p. 517 of 520).[6] Dr. Paolone suggested that Plaintiff not have any guns in his home (Docket No. 12, p. 517 of 520).

#### 4.    SECOND MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

On January 5, 2011, Plaintiff underwent a second Mental Residual Functional Capacity Assessment with Dr. Paolone (Docket No. 12, p. 518 of 520). Dr. Paolone found Plaintiff to have marked limitations in all three tested categories: social interaction, sustained concentration and persistence, and adaption (Docket No. 12, pp. 518-19 of 520).

### IV. STANDARD OF DISABILITY

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. §§ 404.1520 and 416.920.  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007).  DIB and SSI are available only for those who have a "disability." 42 U.S.C. § 423(a), (d); *see also* 20 C.F.R. § 416.920.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Colvin*, 475 F.3d at 730 (*citing* 42

_____

[6] A GAF score of 55 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. DSM-IV, *supra* note 4.

U.S.C. § 423(d)(1)(A)) (definition used in the DIB context); *see also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context).

The Commissioner uses a five-step sequential evaluation process to evaluate a DIB or SSI claim. First, a claimant must demonstrate he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Colvin*, 475 F.3d at 730 (*citing Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). Second, a claimant must show he suffers from a "severe impairment." *Colvin*, 475 F.3d at 730. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (*citing Abbott,* 905 F. 2d at 923). At the third step, a claimant is presumed to be disabled regardless of age, education, or work experience if he is not engaged in substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets the requirements of a "listed" impairment. *Colvin*, 475 F.3d at 730.

Prior to considering step four, the Commissioner must determine a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(e), 416.920(e). An individual's residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). It "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).The Commissioner must next determine whether the claimant has the residual functional capacity to perform the requirements of his past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). If he does, the claimant

20

is not disabled.

Finally, even if the claimant's impairment does prevent him from doing past relevant work, the claimant will not be considered disabled if other work exists in the national economy that he can perform.  *Colvin*, 475 F.3d at 730 (*citing Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (internal citations omitted) (second alteration in original)).  A dispositive finding by the Commissioner at any point in the five-step process terminates the review.  *Colvin*, 475 F.3d at 730 (*citing* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)).

## V. THE COMMISSIONER'S FINDINGS

After careful consideration of the disability standards and the entire record, ALJ Rippel made the following findings:

1.  Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2012.

2.  Plaintiff has not engaged in substantial gainful activity since January 28, 2006, the amended application date.

3.  Plaintiff has the following severe impairments: back pathology including degenerative disc disease, herniated disc with facet hypertrophy and foraminal stenosis, chronic back and leg pain, foot pain including plantar fasciitis, bipolar disorder NOS, and a history of cannabis abuse.

4.  Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1.

5.  Plaintiff has the residual functional capacity to perform a full range of light work subject to the following limitations: (1) must have a sit/stand option allowing one-hour alternating intervals; (2) no more than occasional bilateral foot control operation; (3) no work that requires more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, or crawling; (4) no work that requires climbing ladders, ropes, or scaffolds; (5) avoid concentrated exposure to the cold, hazardous or moving machinery, and unprotected heights; (6) work must be limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple work-related decisions with no more than occasional workplace changes; and (7) work should involve no more than occasional and superficial interaction with the public, coworkers, and

21

supervisors.

6.    Plaintiff is unable of performing any past relevant work.

7.    Plaintiff was born on April 6, 1982, and was 23 years old, which is defined as a younger individual age 18-49 on the alleged disability onset date.

8.    Plaintiff has a limited education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that Plaintiff is "not disabled" whether or not Plaintiff has transferable job skills.

10.   Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11.   Plaintiff has not been under a disability, as defined in the Social Security Act, from January 28, 2006, through the date of this decision.

(Docket No. 12, pp. 24-31 of 520). ALJ Rippel denied Plaintiff's request for DIB and SSI benefits

(Docket No. 12, p. 31 of 520).

## VI. STANDARD OF REVIEW

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42

U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 832-

33 (6th Cir. 2006).  In conducting judicial review, this Court must affirm the Commissioner's

conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact

that are unsupported by substantial evidence.  *Id.* (*citing Branham v. Gardner*, 383 F.2d 614, 626-27

(6th Cir. 1967)).  "The findings of the [Commissioner] as to any fact if supported by substantial

evidence shall be conclusive . . ." *McClanahan*, 474 F.3d at 833 (*citing* 42 U.S.C. § 405(g)).

"Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

22

*McClanahan*, 474 F.3d at 833 (*citing Besaw v. Sec'y of Health and Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992)).  "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (*citing Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

## VII. DISCUSSION

### A.   PLAINTIFF'S ALLEGATIONS

In his Brief on the Merits, Plaintiff alleges: (1) the ALJ's decision concerning Plaintiff's physical residual functional capacity was not based upon a legally sufficient record; and (2) the ALJ failed to assign the appropriate weight to Plaintiff's treating physicians' findings and opinions with regard to Plaintiff's mental residual functional capacity (Docket No. 16).

### B.   DEFENDANT'S RESPONSE

Defendant contends that: (1) substantial evidence supports the ALJ's finding that Plaintiff could perform a modified range of light work; and (2) the ALJ accorded proper weight to Plaintiff's mental health medical source opinions (Docket No. 17).

### C.   DISCUSSION

#### 1.   PHYSICAL RESIDUAL FUNCTIONAL CAPACITY

Plaintiff alleges the ALJ erred when he determined Plaintiff was capable of performing a reduced range of "light" work (Docket No. 17, pp. 9-18 of 18). To properly determine a claimant's ability to work and the corresponding level at which that work may be performed, the ALJ must determine the claimant's residual functional capacity. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633

(6th Cir. 2004). According to Social Security Regulations, residual functional capacity is designed to describe the claimant's physical and mental work abilities. *Id*. Residual functional capacity is an administrative "assessment of [the claimant's] physical and mental work abilities – what the individual can or cannot do despite his or her limitations." *Converse v. Astrue*, 2009 U.S. Dist. LEXIS 126214, *16 (S.D. Ohio 2009); *see also* 20 C.F.R. § 404.1545(a). Residual functional capacity "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting on a **regular and continuing** basis . . . A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Converse*, 2009 U.S. Dist. LEXIS 126214 at *17 (*quoting SSR* 96-8p, 1996 SSR LEXIS 5 (July 2, 1996) (emphasis in original) (internal citations omitted)).

To determine a claimant's residual functional capacity, the Commissioner will make an assessment based on all relevant medical and other evidence. 20 C.F.R. § 20.1545(a)(3). Before making a final determination that a claimant is not disabled, the Commissioner bears the responsibility of developing the claimant's complete medical history. 20 C.F.R. § 20.1545(a)(3). The Commissioner "will consider any statements about what [a claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations. [The Commissioner] will also consider descriptions and observations of [a claimant's] limitations from [his] impairment(s), including limitations that result from [his] symptoms, such as pain, provided by [claimant], [his] family, neighbors, friends, or other persons." 20 C.F.R. § 20.1545(a)(3). Responsibility for deciding residual functional capacity rests with the ALJ when cases are decided at an administrative hearing. *Webb*, 368 F.3d at 633.

In the present case, ALJ Rippel found, upon consideration of the entire record, that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 416.927 and

24

416.929 (Docket No. 10, p. 20 of 490).[7] With regard to Plaintiff's lower back pain, ALJ Rippel acknowledged Plaintiff's mild degenerative disc disease and spondylotic changes of the lumbar spine (Docket No. 12, p. 29 of 520). However, the ALJ also noted Plaintiff's lack of motor loss or limited range of motion, or radiculopathy or peripheral neuropathy, based on Plaintiff's 2008 MRI (Docket No. 12, p. 29 of 520).

While it is true that the ALJ assigned "great" weight to the opinion of the State agency examiner, ALJ Rippel *also* found the examiner's findings to be an *underestimation* of Plaintiff's limitations (Docket No. 12, p. 29 of 520). While State agency examiner Dr. Albert found Plaintiff capable of performing a medium level of exertion, ALJ Rippel determined that Plaintiff's lower back limitations allowed him to perform only at a light level of exertion (Docket No. 12, p. 29 of 520). When viewed as a whole, there is nothing in Plaintiff's record to suggest that Plaintiff is unable to work at this level of exertion.

Plaintiff consistently attributes his lower back pain to two car accidents he was involved in, one on October 13, 2004, and one on August 16, 2006 (Docket No. 12, pp. 293, 367 of 520). Immediately after the October 2004 accident, Plaintiff rated his lower back pain at only a five out of a possible ten (Docket No. 12, p. 367 of 520). Even nearly one year later, when Plaintiff began seeing Dr. Tsai, he was still rating his back pain a five out of ten (Docket No. 12, p. 256 of 520). Interestingly, only two weeks later, during an October 12, 2005, appointment with physical therapist Mr. Silverio, Plaintiff rated his pain at a level seven or eight (Docket No. 12, p. 260 of 520). Despite this alleged level of pain, Mr. Silverio found Plaintiff to have "good" rehabilitation potential (Docket No. 12, p. 261 of

---

[7] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

520). By November 11, 2005, Plaintiff was reporting some improvement in his symptoms due to the physical therapy (Docket No. 12, p. 358 of 520). Plaintiff was discharged from physical therapy after it was noted that his lumbar spine had a full range of motion without pain and that Plaintiff had attempted some vigorous activities, such as cutting wood (Docket No. 12, pp. 270, 356 of 520). By November 16, 2005, Plaintiff himself stated that he felt up to returning to work (Docket No. 12, p. 354 of 520). At this time, Plaintiff was working as a brickyard laborer (Docket No. 12, p. 200 of 520). Plaintiff returned to that job and later held jobs working as a trash hauler, foundry laborer, trucking agency laborer, steel plant laborer, newspaper deliverer, and hauling laborer (Docket No. 12, p. 200 of 520).

During the relevant time period, Plaintiff repeatedly had unremarkable clinical examinations. Although Plaintiff presented with some tenderness in his lower back (Docket No. 12, pp. 285, 367, 396, 397, 401 of 520), he experienced no motor or sensory loss (Docket No. 12, p. 366 of 520), good muscular strength (Docket No. 12, pp. 260, 314, 354 of 520), normal gait (Docket No. 12, pp. 337, 388, 397 of 520), and good reflexes (Docket No. 12, pp. 260, 340, 354, 366, 367 of 520). A majority of Plaintiff's diagnostic tests were equally as unremarkable. Plaintiff had x-rays, CT scans, and MRI testing of his lower back on multiple occasions, most reporting normal results (Docket No. 12, pp. 260, 283, 324, 336, 339, 354, 356, 374, 398, 400, 404 of 520). In fact, the only MRI that yielded abnormal results was the MRI performed on November 1, 2010, more than six years after Plaintiff's initial car accident, wherein Plaintiff was diagnosed with a herniated disc at the L4-5 vertebrae and a bulging disc at the L5-S1 vertebrae (Docket No. 12, p. 520 of 520).

Plaintiff alleges that ALJ Rippel's failure to address this November 2010 MRI, as well as an MRI and bone scan conducted in August 2009 warrants a remand (Docket No. 16, pp. 9-13 of 16).

26

While it is true that ALJ Rippel did not specifically mention these reports in his decision, remand is not necessary. Plaintiff's 2009 and 2010 MRIs did not add anything remarkably new to Plaintiff's overall medical record. The August 1, 2009, MRI of Plaintiff's lumbar spine revealed *mild* "multilevel disc disease and degenerative changes" and an acute Schmorl's Node deformity (Docket No. 12, p. 463 of 520). Likewise, Plaintiff's November 1, 2010, MRI of his lumbar spine revealed severe right and moderate to severe left-sided foraminal stenosis at the L4-5 vertebrae and a mild diffuse disc bulge at the L5-S1 vertebrae (Docket No. 12, p. 520 of 520). Most of these conditions were previously diagnosed. Plaintiff's November 16, 2005, CT scan showed evidence of the Schmorl's Node deformity and Plaintiff's November 21, 2008, and August 1, 2009, MRIs showed evidence of mild degenerative disc disease (Docket No. 12, pp. 283, 356, 459 of 520). Although the foraminal stenosis and disc bulging seemed to be new diagnoses, their presence does not change the overall tenor of Plaintiff's medical record which, when taken as a whole, indicates that Plaintiff suffers from some mild to moderate lower back pathology.

Furthermore, and perhaps most telling of ALJ Rippel's consideration of these medical records, is his decision that the State agency examining physician *overestimated* Plaintiff's abilities (Docket No. 12, p. 28 of 520). Where State examiner Dr. Albert found Plaintiff capable of medium level work, ALJ Rippel acknowledged Plaintiff's lower back difficulties and found him capable of only light work (Docket No. 12, p. 28 of 520). Even then, ALJ Rippel placed numerous restrictions, both exertional and non-exertional, on Plaintiff's ability to work (Docket No. 12, p. 28 of 520). While it may be ideal for an ALJ to set forth his reasons specifically crediting or discrediting each and every submitted medical opinion of record, it is well settled in the Sixth Circuit that "an ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a

27

party . . . so long as his factual findings as a whole show that he implicitly resolved [any] conflict."

*Loral Defense Systems-Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999). An ALJ is "not required to

discuss or summarize every piece of evidence in the record." *Szymanski v. Comm'r of Soc. Sec.*, 2011

U.S. Dist. LEXIS 117096, *22-23 (N.D. Ohio 2011).

Finally, the undersigned Magistrate acknowledges Plaintiff's reliance on *Deskin v. Comm'r of*

*Soc. Sec.* (605 F.Supp.2d 908 (N.D. Ohio 2008)). It is true that this case states, "as a general rule,

where the transcript contains only diagnostic evidence and no opinion from a medical source about

functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility

to develop a complete record, the . . . ALJ . . . must recontact the treating source, order a consultative

examination, or have a medical expert testify at the hearing." *Deskin*, 605 F.Supp.2d at 912. In *Deskin*,

the ALJ gave only brief mention of a physical residual functional capacity assessment completed by a

state agency physician and was alleged to have failed to consider the Plaintiff's medical record in its

entirety. *Id*. at 909-10. The court, while acknowledging the ALJ's ultimate authority to determine the

plaintiff's residual functional capacity, noted,

> where the ALJ proceeds to make a residual functional capacity decision in the absence of
> a medical opinion as to functional capacity from *any* medical source, or as here, with one
> made without the benefit of a review of a substantial amount of the claimant's medical
> records, there exists cause for concern that such substantial evidence may not exist.

*Id*. at 911.

Unlike in *Deskin*, ALJ Rippel conducted a thorough review of Plaintiff's entire medical record.

Again, this is most easily evidenced by the ALJ's reduction in Plaintiff's recommended work-exertion

level. ALJ Rippel did not simply interpret "raw medical data" (*Deskin*, 605 F.Supp.2d at 912); rather,

he looked at the objective medical evidence, as well as the opinion of Dr. Albert, before rendering his

decision (Docket No. 12, p. 29 of 520).

28

Therefore, Plaintiff's first claim is without merit and the Magistrate recommends the decision of the Commissioner be affirmed.

### 2.    MENTAL RESIDUAL FUNCTIONAL CAPACITY AND MEDICAL SOURCE OPINIONS

Plaintiff also alleges that the ALJ failed to assign the appropriate weight to the opinions of Plaintiff's treating mental health physician in determining Plaintiff's mental residual functional capacity (Docket No. 16, pp. 13-14 of 16). Specifically, Plaintiff argues that ALJ Rippel gave great weight to the opinion of non-examining State agency physician Dr. Hoffman, while giving less weight to Plaintiff's treating mental health physician, Dr. Paolone (Docket No. 16, p. 14 of 16). Defendant argues that the ALJ's determination of Plaintiff's mental residual functional capacity was well supported by the objective medical record (Docket No. 17, p. 14 of 18).

The Sixth Circuit provided a detailed summary of the treating physician rule in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). According to the Court, the treating physician rule:

> requires the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians because these sources are likely to be the medical professional most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (*quoting* 20 C.F.R. § 404.1527(d)(2)).

> The ALJ must give a treating source opinion controlling weight if the treating source opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. *Wilson*, 378 F.3d at 544. On the other hand . . . it is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent . . . with other substantial evidence in the case record. *SSR* 96-2p, 1996 SSR LEXIS 9 at *5 (July 2, 1996). If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion,

consistency of the opinion with the record as a whole, and any specialization of the treating physician. *Wilson*, 378 F.3d at 544.

[T]he regulations require the ALJ to always give good reasons in the notice of determination or decision for the weight given to the claimant's treating source's opinion. 20 C.F.R. § 404.1527(d)(2). Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *SSR* 96-2p, 1996 SSR LEXIS 9 at *12.

*Blakley*, 581 F.3d at 406-07 (internal quotations omitted). ALJ Rippel's assessment of Plaintiff's mental residual functional capacity is well supported by the objective medical evidence.

First, Plaintiff alleges that Dr. Paolone is his treating physician (Docket No. 16, p. 14 of 16). This is likely true, although just barely. According to Social Security regulations, the term "treating source" means "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. According to Plaintiff's medical record, he first saw Dr. Paolone on November 12, 2010 (Docket No. 12, p. 516 of 520). The record shows that Plaintiff had only two additional visits with Dr. Paolone, one on October 11, 2010 (Docket No. 12, p. 501 of 520), and one on October 25, 2010 (Docket No. 12, p. 500 of 520), prior to Dr. Paolone issuing his June 5, 2011, Mental Residual Functional Capacity Assessment (Docket No. 12, p. 518 of 520). Although this frequency seems somewhat normal for mental health treatment, it is questionable as to whether two one-hour counseling sessions can really form the basis of an individual's mental residual functional capacity.

This is further evidenced by Dr. Paolone's findings. In his assessment, Dr. Paolone assigned Plaintiff a GAF score of fifty-five. By its very definition, a GAF score between fifty-one and sixty describes *moderate* symptoms or disability. However, Dr. Paolone indicated that Plaintiff had *marked*

limitations in every single evaluated category: social interaction, sustained concentration and persistence, and adaptation (Docket No. 12, pp. 518-19 of 520). Additionally, given the relatively short duration of Plaintiff's treatment relationship with Dr. Paolone, the doctor failed to indicate whether Plaintiff's limitations could be expected to last a continuous twelve months (Docket No. 12, pp. 516-17 of 520).[8]

Furthermore, Dr. Paolone's assessment simply does not square with the rest of Plaintiff's record with regard to his mental residual functional capacity. Although it is clear that Plaintiff suffered from some level of negative thinking, anger, and suicidal ideation (Docket No. 12, pp. 49-58 of 520), even describing himself as "messed up" (Docket No. 12, p. 53 of 520), Plaintiff failed to seek mental health treatment until October 2010, nearly five years after his alleged onset of disability (Docket No. 12, p. 505 of 520). During his evaluation with Dr. Brown, Plaintiff was "alert and oriented to person, place, and time" (Docket No. 12, p. 419 of 520). Plaintiff denied having any suicidal ideations and denied ever attempting to harm himself (Docket No. 12, p. 420 of 520). Plaintiff also indicated that he possessed the ability to take care of his personal needs and that he gets up by seven o'clock, watches television, does household chores and "cleans off the sidewalk and the steps," and that he and his girlfriend share the cooking, cleaning, and shopping responsibilities (Docket No. 12, pp. 420, 422 of 520). A similar report was given by Dr. Hoffman in her evaluation of Plaintiff's mental residual functional capacity (Docket No. 12, pp. 431-34 of 520). Although Plaintiff expressed suicide attempts (Docket No. 12, p. 49 of 520) and stated that he was "messed up" during his testimony (Docket No. 12, p. 53 of 520), his credibility is questionable. Not only does Plaintiff's testimony conflict with what

_____

[8] Under Social Security regulations, a disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

he told Dr. Brown, as stated above, there is evidence in that record that Plaintiff is not always

forthright in describing his actual symptoms and limitations (Docket No. 12, p. 293 of 520).

      Based on the objective medical evidence, the ALJ accorded proper weight to both Plaintiff's

treating and non-treating mental health physicians. Therefore, Plaintiff's second argument is without

merit and the Magistrate recommends that the opinion of the ALJ be affirmed.

## VIII. CONCLUSION

      For the foregoing reasons, this Magistrate recommends that the decision of the Commissioner

be affirmed.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   January 14, 2013

## IX. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto

32

has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please note that the Sixth Circuit Court of Appeals determined in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) that failure to file a timely objection to a Magistrate's report and recommendation foreclosed appeal to the court of appeals. In *Thomas v. Arn*, 106 S.Ct. 466 (1985), the Supreme Court upheld that authority of the court of appeals to condition the right of appeal on the filing of timely objections to a report and recommendation.